# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# NEW ALBANY DIVISION

| | |
|---|---|
| PEKIN LIFE INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:09-cv-00122-TWP-WGH |
| | ) |
| DAVID KOPITZKE, MATTHEW KOPITZKE, | ) |
| And CHRISTOPHER KOPITZKE, | ) |
| | ) |
| Defendants. | ) |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Pekin Life Insurance Company's ("Pekin") Motion for Summary Judgment [Dkt. 36]. This issue arises from an insurance dispute between Pekin and David Kopitzke, Matthew Kopitzke and Christopher Kopitzke (collectively, the "Beneficiaries") over a life insurance policy that Pekin issued to Erick Kopitzke ("Mr. Kopitzke"). Pekin brought this declaratory judgment action to determine by which standard the death benefit payable to the Beneficiaries should be measured based upon a suicide clause in the policy. The parties have stipulated that Mr. Kopitzke's death was the result of suicide [Dkt. 63]; thus, the only issue left to be determined by this Court is regarding the applicability of the suicide provision in the policy. For the reasons set forth below, Pekin's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

For purposes of this summary judgment motion, the following material facts are not in dispute.[1] In 1999, Pekin issued Kopitzke a 10-year level term life insurance policy under policy

---

[1] The Beneficiaries have failed to set forth a Statement of Facts in Dispute in their response brief [Dkt. 56] in accordance with Local Rule 56.1(b), and, accordingly, under Local Rule 56.1(e) the Court may accept the factual assertions set forth in Plaintiff's brief as existing without controversy.

number 0001931410 with a death benefit of $750,000.00 (the "1999 Policy"). The premiums under the 1999 Policy were $3,750.00 per year until year ten, at which point the guaranteed maximum annual premium increased to $44,700.00 in year eleven per the 1999 Policy's premium schedule. The 1999 Policy contained a renewal provision which provided that the policy was renewable to age 95 at the premium levels listed on the schedule. The 1999 Policy also contained a conversion option that would have permitted Mr. Kopitzke to exchange the policy for a permanent life insurance plan that Pekin issued for conversions with no additional proof of insurability. There was a suicide provision in the 1999 Policy that limited the death benefit to the amount of premiums paid if the insured were to die by suicide within two years of the policy's effective date.

Because the annual premiums in the 1999 Policy were scheduled to increase from $3,750.00 to $44,700.00 beginning in May 2009, Mr. Kopitzke applied for a new term policy to avoid the substantial increase in premium. On May 23, 2008, Mr. Kopitzke's insurance agent, Terry Bright ("Mr. Bright"), submitted a new Application for Insurance to Pekin (the "2008 Application") on behalf of Kopitzke for a new 10-year level term life insurance policy. Mr. Kopitzke submitted a new application, named different beneficiaries, underwent a new medical examination, and his application went through the underwriting process for new policies. Pekin's underwriting guidelines provide that, when a term-life insurance policy holder applies for a new term-life insurance policy, the pre-existing policy is canceled and the new policy is completely underwritten, meaning that the insured must provide proof of insurability for the new policy. Following the submission and approval of the 2008 Application, Mr. Kopitzke requested that Pekin cancel the 1999 Policy.

On August 11, 2008, Pekin canceled the 1999 Policy and issued a new policy to Mr. Kopitzke under policy number 0003039460 (the "2008 Policy"). The 2008 Policy also provided 10-year level term insurance coverage with a death benefit of $750,000.00. Premiums for the 2008 Policy were $5,197.50 per year until year ten, at which point the guaranteed maximum premiums increased to $96,825.00 in year eleven. The 2008 Policy was also renewable to age 95 at the premium levels listed in the policy. An amendment to the 2008 Policy revised the suicide provision, stating that if the insured dies by suicide, while sane or insane, within two years after the policy date, the death proceeds will be limited to the premiums paid.[2]

On June 23, 2009, approximately ten months after the issuance of the 2008 Policy, Mr. Kopitzke was found with a fatal gunshot wound to the chest at his home in North Vernon, Indiana. Detectives investigating the case, the Jennings County Coroner, and the pathologist performing Mr. Kopitzke's autopsy concluded that his fatal injury was self-inflicted and determined that his death was a suicide. Pekin conducted its own internal due diligence death investigation and determined that Mr. Kopitzke had committed suicide within two years of the issuance of the 2008 Policy and, accordingly, concluded that the death benefits under the 2008 Policy were limited to $4,973.98, the total amount of premiums paid on the policy. On August 4, 2009, Pekin sent three separate letters and checks, totaling $4,973.98, to the three Beneficiaries. On August 10, 2009, the Beneficiaries returned the checks to Pekin, stating that there was insufficient evidence that Mr. Kopitzke committed suicide and demanded that Pekin pay the full amount of the $750,000.00 death benefit. Pekin refused, standing by its determination that the Beneficiaries were only entitled to the return of the premiums paid on the 2008 Policy.

---

[2] Presumably this amendment was done for clarification purposes. The original suicide provision language in the 2008 Policy states in part "Any amount for suicide while sane or insane, if the insured commits suicide within 2 years of the Policy effective date. We will refund premiums paid." [Dkt. 45-1 at 6.]

On September 16, 2009, the Beneficiaries filed a state court action in the Circuit Court of Jennings County, Indiana (which was later removed to this Court and docketed as 4:09-cv-00131-DFH-WGH) alleging that Pekin breached the terms of the 2008 Policy and that Mr. Kopitzke "renewed" the 1999 Policy by purchasing the 2008 Policy. On September 17, 2009, Pekin filed this declaratory judgment action seeking a determination that the Beneficiaries are not entitled to more than the premiums paid under the 2008 Policy due to Mr. Kopitzke's suicide within two years of the policy date. Pekin then filed a Motion to Consolidate Cases [Dkt. 11], and the Court consolidated the two actions [Dkt. 14]. The parties initially disputed two issues: (1) whether there was sufficient evidence to support the determination that Mr. Kopitzke's death was a suicide, and (2) whether the 2008 Policy was a new, independent insurance policy or whether it was a mere continuation of the 1999 Policy, meaning that the time period for the suicide provision began in 1999, not 2008. The parties have since stipulated that Mr. Kopitzke died by suicide [Dkt. 63], so the Court need only address the second issue in Pekin's Motion for Summary Judgment.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." *Id.* A party must support its assertion that a fact cannot be or is genuinely disputed by citing to particular parts of materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials" or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the asserted fact. Fed.R.Civ.P. 56(c)(1). When a party fails to either support an assertion of fact or fails to properly address another party's assertion of fact, the court may consider the fact as undisputed for purposes of the motion. Fed.R.Civ.P. 56(e)(2).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted). "The opposing party's burden cannot be met with conclusory statements or speculation, but only with appropriate citations to relevant admissible evidence." *Blevins v. Patton*, No. 1:10-cv-998-WTL-MJD, 2011 WL 837146 at *1 (S.D. Ind. Feb. 25, 2011) (internal citations omitted). "The court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.,* 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III. DISCUSSION

### A. Evidentiary Matters

Plaintiff in its Reply Brief [Dkt. 60], brings to the Court's attention the procedural defects in Defendants' Brief in Response to Pekin's Motion for Summary Judgment [Dkt. 56], and asks the Court to enforce Local Rule 56.1(e) in ruling on its motion. Local Rule 56.1(e) permits the Court to accept the factual assertions presented in the movant's Brief in Support of Summary Judgment as undisputed where the opposing party fails to adhere to the requirements of Local Rule 56.1(b) in submitting its Response Brief in Opposition to Summary Judgment. S.D. Ind. Local Rule 56.1(e). Local Rule 56.1(b) requires that the opposing party's brief include a section labeled "Statement of Material Facts in Dispute" which responds to the movant's asserted material facts by identifying factual disputes and potentially determinative facts that demonstrate that there is dispute of fact that precludes summary judgment. *Blevins*, 2011 WL 837146 at *1. The factual assertions in the Statement of Material Facts in Dispute must be supported by appropriate citations to the record. *Id.*; S.D. Ind. Local Rule 56.1(b). "The failure to submit the required Statement of Material Facts in Dispute concedes the [movant's] version of the facts to the extent they are supported by admissible evidence. This is the consequence of Local Rule 56.1(e)." *Blevins*, 2011 WL 837146 at *2. The district court is well within its discretion to require strict compliance with Local Rule 56.1. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009).

While the Court has the discretion to excuse Defendants' failure to comply with the rule under Local Rule 56.1(i), such excuse is not warranted in this situation. Not only does Defendants' brief fail to include a specific section setting forth disputed material facts as required by the Local Rules, the arguments and assertions included in the Beneficiaries' brief fail

to provide the Court with any means of discerning the factual disputes in the case and provide no citations to any evidence in the record or otherwise. Defendants' brief on the issue before this Court consists of a series of argumentative and conclusory statements, excerpts from what appears to be deposition transcript of an unidentified deponent with no citation to the record, and a block quote from case law without any analysis of how such case law supports their position. [Dkt. 56 at 5.] Defendants have, quite simply, given this Court nothing with which to work. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

If this were a situation where Defendants were proceeding *pro se*, the Court may be able to excuse such oversight and permit the Defendants to rectify their error. However, considering that Defendants are represented by counsel and have been provided several extensions of time to file their response, [Dkts. 47 & 59], such leniency is unwarranted. As such, the Court must proceed with its analysis taking the factual assertions of the Plaintiff as true. This does not mean, however, that Plaintiff is automatically entitled to summary judgment; only that the Court must determine whether Plaintiff is entitled to judgment as a matter of law based upon the facts set forth in its Brief in Support of Summary Judgment. *See Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

### B. The 2008 Policy is Not a Continuation of the 1999 Policy

The primary issue in dispute between the parties is the determination of when the time period for the suicide provision began to run in Mr. Kopitzke's insurance policy with Pekin, which requires an interpretation of the policies. This case comes to the Court on diversity jurisdiction, and because the parties have not raised a conflict of law issue and the case was filed in a federal court in Indiana, Indiana law applies. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384,

390 -391 (7th Cir. 2008). Under Indiana law, "[g]enerally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment." *Morris v. Econ. Fire & Cas. Co.,* 848 N.E.2d 663, 665-666 (Ind. 2006). "A contract for insurance is subject to the same rules of interpretation as are other contracts." *Id.* at 666 (quoting *USA One Ins. Co. of Ind. v. Nuckolls*, 682 N.E.2d 534, 537-38 (Ind. 1997)). "If the language in the insurance policy is clear and unambiguous, then it should be given its plain and ordinary meaning, but if the language is ambiguous, it should be strictly construed against the insurance company." *Id.* at 666. This is especially true where the policy language in question concerns an exclusion clause. *Am. States Ins. Co. v. Kiger,* 662 N.E. 2d 945, 947 (Ind. 1996). However, "ambiguity does not arise simply because the parties disagree on the interpretation, but rather language is ambiguous only if reasonable people could come to different conclusions about its meaning*." RLI Ins. Co.,* 543 F.3d at 390-91.

Here, the parties are not arguing over the ambiguity of the suicide provisions in the policies; rather, the dispute is over which suicide provision applies. Defendants contend that the 2008 Policy was a mere continuation of the canceled 1999 Policy, meaning that the suicide provision in the 1999 Policy is controlling and the two year exclusion period began to run back in 1999, not upon issuance of the 2008 Policy. Thus, the question is whether the subsequent policy is to be regarded as a separate and independent contract or as a continuation of the prior policy. The parties both cite to language from the same case in support of their respective positions:

> It is generally held that when a policy of life insurance is canceled or surrendered and replaced by a new agreement, the new policy does not create a new contract of insurance, but effects a continuance of the original contract so that the liability of the insurer for death by suicide is not affected by the fact that the death occurred within the period specified in the new policy's suicide clause. If the new policy is so different as to constitute an entirely new agreement the original

> suicide clause is inapplicable; but where the later is identical or at least substantially similar to the old policy, it is usually held that the policies should be considered as one agreement.

*Commonwealth Life Ins. Co. v. Jackson*, 432 N.E. 2d 1382, 1388 (Ind. App. 1982) (citations omitted). This is only a general rule and the results of its application depend greatly upon the unique facts and circumstances of each case. *Id.* at 1389. This situation most often arises in the context of conversion policies, where a policyholder exercises their contractual right to convert a policy from one type of insurance plan to another. In *Jackson*, Roy Jackson was the beneficiary of his son Gary Jackson's life insurance policy. Roy Jackson had been insured under a family policy that contained a Family Protection Rider. The rider covered his children until age twenty-five at which point the children had the option to convert their coverage to individual policies without evidence of insurability. The family policy contained a two year suicide provision. Gary Jackson applied and was approved for a conversion policy—which also contained a two year suicide provision—shortly after his twenty-fifth birthday. Approximately a year and a half later, Gary Jackson committed suicide and Roy Jackson submitted his claim as beneficiary. The insurance company denied liability for the benefits, citing the two year suicide provision, and mailed Roy Jackson a check for the amount of premiums paid on the policy. The court held that the second policy was dependent on the first for its existence and was not itself an independent contract, so the suicide provision of the original family policy applied. *Id.* at 1391. The court made this determination based upon the fact that Gary Jackson had exercised a conversion privilege, that the application contained no questions related to insurability or physical examination, and that the insurance company waived the time period during which the privilege could be exercised by retroactively listing the date of issue as of his twenty-fifth birthday. *Id.* The court also discussed several analogous cases, all dealing with conversion policies. *See*

*Western & Southern Life Ins. Co. v. Shelby*, 194 N.E. 197 (Ind. App. 1935) (conversion of a term policy to a whole life policy); *Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389 (1924) (original term policy provided for an on-demand conversion to a life commercial policy); *Gans v. Aetna Life Ins. Co.*, 214 N.Y. 326 (N.Y. 1915) (term policy with three conversion options). Thus, the issue for this Court is whether the 2008 Policy was sufficiently different enough from the 1999 Policy to constitute an entirely new policy, or whether it was substantially similar enough that the policies should be considered one agreement.

Unfortunately we cannot obtain direct evidence from Mr. Kopitzke himself regarding his intentions in entering into the contract for the 2008 Policy, but it is clear from the evidence presented to the Court, and the plain meaning of the contract language itself, that Pekin and Mr. Kopitzke intended to enter into a new, separate policy contract. This case is distinguishable from the *Jackson* case cited by the parties in several respects. First, there is no evidence that Mr. Kopitzke intended to exercise the conversion or renewal privileges in the 1999 Policy when he applied for the 2008 Policy. The 1999 Policy was a 10-year term policy that was renewable up to age 95 at the premium levels listed on the schedule. [Dkt.45-1.] The 1999 Policy provided that Mr. Kopitzke could convert the 10-year term policy into a permanent insurance plan or, if he so chose, Mr. Kopitzke could have continued to renew the policy at the end of the 10-year period—albeit at a drastically higher premium. Mr. Kopitzke clearly had the option to exercise a right of conversion or renewal that would have allowed him to continue under the terms of the 1999 Policy. There is no evidence that Mr. Kopitzke contacted Mr. Bright or any other representative of Pekin for the purpose of exercising his conversion rights when requesting the new policy or otherwise, and Pekin does not convert term policies into other term policies. [Dkt. 45-5 Denning Aff. at 2.] Rather, Mr. Kopitzke opted to apply for an entirely new term policy in

order to obtain lower annual premiums than he would have incurred by renewing the 1999 Policy.

Second, unlike the policies analyzed in *Jackson*, Pekin did not waive evidence of insurability in issuing the 2008 Policy. Pekin required Mr. Kopitzke to submit an entirely new application as a "Proposed Insured," complete with a new medical examination, to obtain the 2008 Policy. Pekin insurance agent Terry Bright testified in his deposition that he intended to submit the 2008 Application on Mr. Kopitzke's behalf in order to obtain a new policy, and Pekin based its issuance of the 2008 Policy upon the information Mr. Kopitzke provided in the 2008 Application. [Dkt. 45-2 Bright Dep. at 16:7-23.] Pekin's underwriting guidelines require that, when an insured has a pre-existing term life insurance policy and he applies for a new term life insurance policy, the pre-existing policy is canceled and the new policy is completely underwritten, meaning that the insured must provide proof of insurability. [Dkt. 45-5 Denning Aff. at 2.] The 2008 Policy went through the full underwriting process and the policy was issued with a new policy number and new premium schedule adjusted for Mr. Kopitzke's age at the time of the second application. [Dkt. 45-2 Bright Dep. at 17:1-20; Dkt. 45-5 Denning Aff. at 2.]

Third, there was nothing in the 1999 Policy that compelled or obligated Pekin to issue the 2008 Policy. Unlike the policies discussed in *Jackson*, there is no evidence that Mr. Kopitzke exercised any contractual right in the 1999 Policy in order to obtain the 2008 Policy, and Pekin did not intend to issue a conversion, exchange, or renewal policy to Mr. Kopitzke. [Dkt. 45-5 Denning Affidavit at 2-3.] Pekin was free to deny coverage to Mr. Kopitzke for the second term life insurance policy if it so chose. The only contractual obligation that Pekin had to Mr. Kopitzke with regard to the issuance of additional coverage beyond the 10-year term was that of automatic renewal at the higher premium level or of conversion to a permanent life insurance

policy if Mr. Kopitzke so requested. Mr. Kopitzke opted not to take advantage of either alternative by applying for the 2008 Policy and requesting cancellation of the 1999 Policy.

All of these factors indicate that the parties did not intend for the 2008 Policy to be a continuation of the 1999 Policy, and instead intended to enter into a new, separate contract of insurance which, as a result, re-started the time period for the suicide provision upon issuance of the new policy. The 2008 Policy is different enough to constitute an entirely new agreement, with a new application, new premium schedule and new beneficiaries. To find that the mere similarity of the policies' terms alone is enough to constitute "substantial similarity" such that the Court must find that the second policy is a continuation of the first under the *Jackson* analysis would lead to absurd results, as insurance companies would have to drastically change their insurance policy offerings to repeat customers—even if they are purchasing the same type of policy coverage—in order to avoid a finding that all subsequent policies are continuations of the previous one. This is not a situation where there is ambiguity in the terms of the insurance policy; therefore, the Court is not permitted to unreasonably interpret the insurance policy in such a manner as to provide greater coverage than was bargained for by the parties themselves. *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1157 (Ind. 1993).

## IV.  CONCLUSION

Because the Court has determined that the 2008 Policy was separate and distinct from the 1999 Policy, the suicide provision of the 2008 Policy applies. Since the parties have stipulated that Mr. Kopitzke's death was the result of suicide and such suicide occurred within the two year suicide provision period, the Beneficiaries are entitled only to the return of the premiums paid on the 2008 Policy and not the full death benefit under the 1999 Policy.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Dkt. 36] is hereby **GRANTED**.

DATED: 05/24/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Richard M. Burgland
PRETZEL & STOUFFER
rburgland@pretzel-stouffer.com

Robert Marc Chemers
PRETZEL & STOUFFER
rchemers@pretzel-stouffer.com

William W. Elinski
PRETZEL & STOUFFER
welinski@pretzel-stouffer.com

Barry N. Bitzegaio
LORCH & NAVILLE, LLC
bbitzegaio@lorchnaville,com

Michael Lee Rogers
ROGERS & BELDING
rogersbelding@yahoo.com